T.C. Memo. 1997-259


UNITED STATES TAX COURT


JOHN SANN AND MARIANNE SANN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21518-88, 21519-88,      Filed June 10, 1997.
       4789-89, 21209-90,
       22399-90, 22466-90.


    <u>Stuart A. Smith</u> and <u>David H. Schnabel</u>, for petitioners.

    <u>Louise R. Forbes</u>, <u>Paul Colleran</u>, <u>Gary S. Gross</u>, <u>Mary P.
Hamilton</u>, and <u>William T. Hayes</u>, for respondent.

---

[1]    Cases of the following petitioners are consolidated for
opinion:  John Sann and Marianne Sann, docket Nos. 21518-88 and
22466-90; Laurence M. Addington, docket Nos. 21519-88 and 22399-
90; and David M. Cohn, docket Nos. 4789-89 and 21209-90.

CONTENTS

Page

MEMORANDUM FINDINGS OF FACT AND OPINION........................ 2
OPINION OF THE SPECIAL TRIAL JUDGE............................ 3
FINDINGS OF FACT............................................. 7
    A. The Plastics Recycling Transactions...................... 7
    B. The Partnerships.......................................10
    C. Richard Roberts........................................12
    D. Guy B. Maxfield.......................................13
    E. Petitioners and Their Introduction to the Partnership
       Transactions.........................................18
       1.  John and Marianne Sann...........................18
       2.  Laurence M. Addington............................22
       3.  David M. Cohn....................................25
OPINION.....................................................30
    A. Statute of Limitations.................................33
    B. Section 6653(a)--Negligence............................39
       1.   The Private Offering Memoranda...................41
       2.   The So-Called Oil Crisis.........................47
       3.   Petitioners' Purported Reliance on an Adviser......50
          a.   The Circumstances Under Which a
              Taxpayer May Avoid Liability Under
              Section 6653(a)(1) and (2) Because
              of Reasonable Reliance on Competent
              and Fully Informed Professional
              Advice.......................................51
          b.   Maxfield.......................................53
       4.   Miscellaneous....................................60
       5.   Conclusion as to Negligence......................70
    C. Section 6659--Valuation Overstatement...................71
       1.   The Grounds for Petitioners' Underpayments.........73
       2.   Concession of the Deficiency.....................77
       3.   Section 6659(e)..................................81
    D. Petitioners' Motions For Leave To File Motion For
       Decision Ordering Relief From the Negligence Penalty
       and the Penalty Rate of Interest and To File Supporting
       Memorandum of Law....................................85

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These cases were assigned to Special Trial

Judge Norman H. Wolfe pursuant to the provisions of section

7443A(b)(4) and Rules 180, 181, and 183.  They were tried and

briefed separately but consolidated for purposes of opinion.[2]

All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transactions and the Sentinel recyclers in these cases are substantially identical to those considered in the Provizer case.

In three notices of deficiency, issued on June 16, 1988, in docket No. 21518-88 (Sann), on June 6, 1988, in docket No. 21519-88 (Addington), and on December 22, 1988, in docket No. 4789-89 (Cohn), respondent determined the following deficiencies in and additions to petitioners' 1981 Federal income taxes:

---

[2] There were three separate trials for these cases. The cases of John Sann and Marianne Sann, docket Nos. 21518-88 and 22466-90, were consolidated for the purposes of receiving certain testimony. The same procedure was followed for the cases of Laurence M. Addington, docket Nos. 21519-88 and 22399-90, and the cases of David M. Cohn, docket Nos. 4789-89 and 21209-90.

| | | Additions to Tax | | |
|---|---|---|---|---|
| Petitioners | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| Sann | $192,666 | $9,633.30 | [1] | $54,582.60 |
| Addington | 63,137 | 3,156.85 | [1] | 18,840 |
| Cohn | 10,250 | 512.50 | [1] | 2,892.30 |

[1]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. The additions to tax determined under section 6653(a)(2) were calculated on the amount of $181,942 in the Sann case; on the amount of $62,800 in the Addington case; and on the amount of $9,641 in the Cohn case.

In another three notices of deficiency, issued on July 19, 1990, in docket Nos. 22466-90 and 22399-90 (Sann and Addington, respectively), and on July 20, 1990, in docket No. 21209-90, (Cohn), respondent determined the following deficiencies in and additions to petitioners' 1982 Federal income taxes:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Petitioners | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | [2]Sec. 6659 |
| Sann | $94,403 | $4,720 | [1] | $23,030 |
| Addington | 44,317 | 2,215.85 | [1] | 10,649 |
| Cohn | 15,893 | 795 | [1] | 4,020 |

[1]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. The additions to tax determined under section 6653(a)(2) were calculated on the full amount of the deficiency in each case.
[2]In the alternative to the sec. 6659 addition to tax, respondent determined an addition to tax under sec. 6661 for substantial understatement of liability. Respondent conceded the sec. 6661 additions to tax in the respective posttrial briefs in each case.

In all six notices of deficiency, respondent also determined that interest on the deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). In the posttrial brief for docket No. 4789-89 (Cohn), respondent asserted a lesser section 6659 addition to tax in the amount of $2,447. We consider the section 6659 addition to tax in docket No. 4789-89 to be accordingly reduced.

On July 1 and July 11, 1994, respondent filed motions for leave to file amended answers in docket Nos. 4789-89 (Cohn) and

21518-88 (Sann), respectively. This Court denied both motions on July 11, 1994.

The parties in each of these cases filed substantively identical Stipulations of Settled Issues concerning the adjustments relating to petitioners' participation in the Plastics Recycling Program. In general, the stipulations provide:[3]

> 1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).
>
> 3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for negligence under the applicable provisions of §6653(a).
>
> 4. With respect to the issue of the addition to the tax under I.R.C. §6659, petitioners do not intend to contest the value of the Sentinel Recycler or the existence of a valuation overstatement on the petitioners' return. Petitioners, however, reserve the

---

[3]   The stipulations of settled issues in both of the Cohn cases, and in the Addington case for 1981, are written in the singular. Also, the stipulations of settled issues filed in the Cohn cases expressly refer to the sec. 6659 addition to tax as an unresolved issue in the third stipulation. Finally, the stipulation of settled issues in the Cohn case for 1982 (docket No. 21209-90) expressly refers to Foam Recycling and Jabrilach Recycling, instead of "the Plastics Recycling Program".

right to argue that the underpayment in tax is not attributable to a valuation overstatement within the meaning of I.R.C. §6659(a)(1), and that the Secretary should have waived the addition to the tax pursuant to I.R.C. §6659(e).

In the stipulations of settled issues for docket Nos. 21209-90 (Cohn), 22399-90 (Addington), and 22466-90 (Sann), petitioners also reserved the right to argue whether the respective assessments of tax and additions to tax for 1982 were barred by the statute of limitations.

Long after the trials of these cases, in each case petitioners filed a Motion For Leave to File Motion for Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and to File Supporting Memorandum of Law under Rule 50. These motions were filed with attached exhibits during the last week of October and first week of November 1995. Petitioners concurrently lodged with the Court motions for decision ordering relief from the additions to tax for negligence and the increased rate of interest, with attachments and memoranda in support of the motions. Subsequently, respondent filed objections, with attachments and memoranda in support thereof, and petitioners thereafter filed reply memoranda. For reasons discussed in more detail subsequently in this opinion, and also in Farrell v. Commissioner, T.C. Memo. 1996-295, these motions shall be denied. See also Friedman v. Commissioner, T.C. Memo. 1996-558; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v.

<u>Commissioner</u>, T.C. Memo. 1996-399; <u>Zenkel v. Commissioner</u>, T.C. Memo. 1996-398.

The issues remaining in these consolidated cases are: (1) Whether the assessments for 1982 are time-barred; (2) whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2); and (3) whether petitioners are liable for the additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

<u>A. The Plastics Recycling Transactions</u>

These cases concern petitioners' indirect investments in three limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: Empire Associates (Empire), Plymouth Equipment Associates (Plymouth), and Foam Recycling Associates (Foam). For convenience we refer to these partnerships collectively as the Partnerships.

Petitioners acquired their indirect interests in the Partnerships through three other partnerships: S&H Empire (a tier of Empire), Plymouth Partners (a tier of Plymouth), and Jabrilach Recycling (a tier of Foam).

The transactions involving the Sentinel EPE recyclers purportedly leased by the Partnerships are substantially

identical to those in the Clearwater Group limited partnership
(Clearwater), the partnership considered in Provizer v.
Commissioner, T.C. Memo. 1992-177.  Petitioners have stipulated
substantially the same facts concerning the underlying
transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI),
manufactured and sold six Sentinel EPE recyclers to ECI Corp. for
$981,000 each.  ECI Corp., in turn, resold the recyclers to F & G
Corp. for $1,162,666 each.  F & G Corp. then leased the recyclers
to Clearwater, which licensed the recyclers to FMEC Corp., which
sublicensed them back to PI.  The sales of the recyclers from PI
to ECI Corp. were financed with nonrecourse notes.  Approximately
7 percent of the sales price of the recyclers sold by ECI Corp.
to F & G Corp. was paid in cash with the remainder financed
through notes.  These notes provided that 10 percent of the notes
were recourse but that the recourse portion of the notes was only
due after the nonrecourse portion, 90 percent, was paid in full.[4]

No arm's-length negotiations for the price of the Sentinel
EPE recycler took place between or among PI, ECI, and F & G Corp.
All of the monthly payments required among the entities in the
above transactions offset each other.  These transactions were
done simultaneously.  Although the recyclers were sold and leased

---

[4]    In the Foam transaction, such notes provided that 20 percent
of the notes were recourse but that the recourse portion of the
notes was only due after the nonrecourse portion, 80 percent, was
paid in full.

for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and up to the end of 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, Empire and Plymouth leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. The Empire and Plymouth transactions differ from the underlying transactions in the Provizer case in two respects: (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp.; and (2) the circumstance that seven machines were sold, leased, licensed, and sublicensed by Empire and Plymouth. Foam leased four Sentinel EPE recyclers from F & G Corp., but it did not license them to FMEC. Instead, in its fourth transaction, Foam entered into (1) a 1-year consulting agreement with the president of PI, John D. Bambara (Bambara), who was to assist in the placement of the machines with end-users, and (2) a joint venture agreement with PI for the further processing and sale of the output of the Sentinel EPE recyclers.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp. or Bambara, and PI as the Partnership transactions. In

addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

B. The Partnerships

Empire, Plymouth, and Foam are New York limited partnerships. Empire closed on November 23, 1981; Plymouth closed on December 21, 1981; and Foam closed on September 22, 1982. Foam is subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) Pub. L. 97-248, 96 Stat. 324.

Richard Roberts (Roberts) is the general partner of each of the Partnerships. Roberts also was the Tax Matters Partner (TMP) for Foam during 1982 and at all other times relevant hereto.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners. Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda. Ulanoff owns a 1.27-percent interest in Plymouth and a 4.37-percent interest in Taylor Recycling Associates. Burstein owns a 2.605-percent interest in Empire and a 5.82-percent interest in Jefferson Recycling Associates. Like Empire and Plymouth, Taylor Recycling Associates and Jefferson

Recycling Associates are partnerships that leased Sentinel recyclers. Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

The offering memoranda for Empire, Plymouth, and Foam state that the general partner will receive fees from those partnerships in the respective amounts of $35,000, $37,500, and $25,000.[5] In addition, each of the offering memoranda provide that the general partner may retain as additional compensation all amounts not paid as sales commissions or offeree/purchaser representative fees. According to the offering memoranda, 10 percent of the proceeds from each offering ($95,000 in the case of Empire, $97,500 in the case of Plymouth, and $60,000 in the case of Foam) was allocated to the payment of sales commissions and offeree/purchaser representative fees. Consequently, Roberts was scheduled to receive a minimum of $97,500 and up to a maximum of $350,000 from the Partnerships.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service

_____

[5] The Foam limited partnership agreement provided that the $37,500 fee was "payable ten (10) days after the Closing." The limited partnership agreements for Empire and Plymouth provided that the fees of $35,000 and $37,500, respectively, were payable "ten (10) days after the Sentinel Recyclers are delivered to a licensee thereof." Such amounts were essentially guaranteed because FMEC and PI were committed to be licensees of the recyclers.

(IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value;[6] (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling equipment and is required to devote only such time to the Partnerships as he deems necessary; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.  The Foam offering memorandum also notes that "since August 1981, PI has become a sublicensee of 104 other Sentinel Recyclers" and that it has "encountered longer start-up periods than anticipated".

C.  Richard Roberts

Roberts is a businessman and the general partner in a number of limited partnerships that leased and licensed Sentinel EPE recyclers, including Empire, Plymouth, and Foam.  He also is a 9-percent shareholder in F & G Corp., the corporation that leased the recyclers to the Partnerships.  From 1982 through 1985,

---

[6]    The offering memoranda note that "Such purchase price is the basis for computing the regular investment and energy tax credits to be claimed by the Partnership."

Roberts maintained the following office address with Raymond

Grant (Grant), the sole owner and president of ECI Corp.:

> Grant/Roberts
> Investment Banking
> Tax Sheltered Investments
> 745 Fifth Avenue, Suite 410
> New York, New York  10022

Grant was instrumental in the hiring of Ulanoff as an evaluator

of the Plastics Recycling transactions; the two had met on a

cruise.  Roberts and Grant together have been general partners in

other investments.

Prior to the Partnership transactions, Roberts and Grant

were clients of the accounting firm H. W. Freedman & Co.

(Freedman & Co.).  Harris W. Freedman (Freedman), a certified

public accountant (C.P.A.) and the named partner in Freedman &

Co., was the president and chairman of the board of F & G Corp.

He also owned 94 percent of a Sentinel EPE recycler.  Freedman &

Co. prepared the partnership returns for ECI Corp., F & G Corp.,

Empire, Plymouth, and Foam.  It also provided tax services to

Bambara.  Bambara is the 100-percent owner of FMEC Corp., as well

as its president, treasurer, clerk, and director.  He, his wife,

and daughter also owned directly or indirectly 100 percent of the

stock of PI.

## D.  Guy B. Maxfield

Guy B. Maxfield (Maxfield) is an attorney specializing in

tax matters.  He does not have an engineering background and he

is not an expert in plastics materials or plastics recycling.

Maxfield earned an undergraduate degree in 1955 from Augustana College and was elected to Phi Beta Kappa.  He then attended Michigan Law School where he became a member of the Law Review and was elected to the Order of the Coif.  He graduated Summa Cum Laude in 1958.  After law school Maxfield became employed by the law firm of White & Case in New York City.  In 1963 he left White & Case to be an assistant professor in the graduate tax program at the New York University (NYU) Law School.  He became a full professor 12 to 14 years later.  Maxfield has written articles for Law Reviews and co-authored a book on Federal estate and gift taxation.  During his tenure at NYU he has been "of counsel" to various law firms.  For approximately 10 years he was of counsel to the law firm of Gifford, Woody, Carter & Hayes.  Sometime in 1981 he became of counsel to the law firm of Sann & Howe.  Among his various functions at the firm, Maxfield reviewed tax-advantaged investments at Sann & Howe.

Maxfield learned of the Plastics Recycling transactions in 1981 from John Y. Taggart (Taggart), a tax partner at the law firm of Windels, Marx, Davies & Ives (WMDI).  Taggart and other attorneys at WMDI prepared the offering memoranda, tax opinion, and other legal documents for Empire and Plymouth.  Maxfield and Taggart were close personal friends.  They had known each other since 1959 when they were colleagues at White & Case.  Maxfield was the "best man" at Taggart's wedding and named Taggart as executor of his will.  Before joining WMDI, Taggart also had been

employed by the U.S. Treasury Department in the Office of Tax Legislative Counsel, and then as a full-time member of the faculty of the NYU Law School and editor in chief of the Tax Law Review. Over the years, Maxfield and Taggart exchanged information concerning investment opportunities that they considered interesting. Taggart owned a 6.66-percent interest in a second-tier Plastics Recycling partnership. Maxfield did not consider Taggart to be an expert in engineering or plastics recycling.

Maxfield estimates that in 1981 he spent 50 to 75 or more hours investigating the Plastics Recycling transactions. His investigation involved reading the offering memorandum and questioning Roberts and Taggart. Scheduling conflicts prevented him from visiting PI until 1982. However, another attorney at Sann & Howe, Roger Wible (Wible), visited PI in 1981 and reported his observations to Maxfield. Maxfield was told by Roberts and persons at PI that competitive machines were not as efficient as the Sentinel EPE recycler and that the owners of the other machines had trouble placing them with end-users.

Maxfield was concerned with various aspects of the Plastics Recycling transactions, such as how Roberts, as a promoter, would profit from the transactions. In Maxfield's experience, oftentimes promoters of tax advantaged investments were highly compensated regardless of the success of the investment. Maxfield understood from Roberts that the source of Roberts'

profits, as a promoter, would be the operation of the Partnerships. Maxfield satisfied himself that "the general partner had a real economic incentive to make these things work if he was going to ever sell anymore of--of these things."

Maxfield visited PI in 1982 to see what it was like and "to hear from some of the technical people there." Although Maxfield's perspective was that of "a tax lawyer" and "not a scientist", he thought that he "could at least listen, and if * * * [he] had questions on their discussion, * * *[he] could ask them." As Maxfield explained his understanding, the Sentinel EPE recyclers would serve the following function:

> The function served by these recycling machines [was to grind and chemically condense the plastic waste,] which would then be reformatted into plastic pellets and sold * * *
> They would simply tell the factory we have a way-- we will dispose of--of your waste products without charging you anything. We will provide a machine that you can use without any cost.

In fact, end-users were not provided Sentinel EPE recyclers without cost; they bore the service and installation costs. According to Maxfield, among the criteria required of potential end-users was "the physical space in their factory to have * * * [the] machine installed" and the willingness to "spend something- -roughly $5,000 or $6,000, if necessary, for the wiring of the machine." Maxfield testified that he thought that there were "thousands and thousands and thousands" of potential end-users for the recycler.

"One of the fundamental questions" Maxfield had about the Plastics Recycling transactions was whether the Sentinel EPE recycler was overpriced. Notwithstanding his concern, Maxfield did not consult an independent expert about the machines. Instead, he relied upon the reports of F & G Corp.'s evaluators, Burstein and Ulanoff, as confirmation of the machine's purported value. Maxfield did not know that Burstein and Ulanoff were investors in the Plastics Recycling transactions. He never spoke to them and did not ask Roberts or Taggart whether Burstein and Ulanoff were investors. At a meeting held at Sann & Howe to discuss the investment, Maxfield mentioned that hiring an independent expert or appraiser was an option for confirming the value of the machine. As Maxfield recalled:

> I mentioned that specifically, it was [a] possibility, and they--somebody said, well, who? And I said I frankly don't know, and I also don't know what the charge would be, I have no idea.
> *       *       *
> I don't believe any of the people at Sann & Howe actually hired another expert, but I said that's a possibility.

Maxfield also told the members of Sann & Howe that he considered the relationship between the value of the recycled pellets and the price of oil to be a negative aspect of the investment. As he acknowledged, "I had no training to decide which way the price of oil was going to go and therefore--so on."

Maxfield never represented to anyone at Sann & Howe that he was an expert in plastics recycling or engineering. In addition,

Maxfield always stressed that he "was not an investment analyst."
Maxfield described his role in analyzing and investigating the
Plastics Recycling transactions as follows:  "I really viewed my
role as I was a conveyor of information and of my impressions.  I
made it very clear to each of the potential investors, it's their
business decision, not mine." (Emphasis added.)  Reflecting upon
his own decision to invest in the Plastics Recycling
transactions, Maxfield stated, "there were obviously--if I would
have asked the right questions, I wouldn't have made the
investment."

E.  Petitioners and Their Introduction to the Partnership
Transactions

Petitioners in these cases do not have any education,
training, or experience in engineering, plastics recycling, or
plastics materials.  They did not independently investigate the
Sentinel EPE recyclers or see a Sentinel EPE recycler or any
other type of plastics recycler prior to participating in the
recycling ventures.  Petitioners never made a profit in any year
from their investments in the Partnerships.

1.  John and Marianne Sann

Petitioners John Sann and Marianne Sann resided in
Larchmont, New York, when their petitions were filed.  John Sann
(Sann) was born and raised in Amsterdam in the Netherlands.
After attending the Lyceum and the University of Lausanne in
Switzerland, he served in the Royal Air Force in England and the

Dutch Air Force in Holland for several years.  He then pursued a law degree at the University of Amsterdam, transferred to Columbia Law School in New York City, and graduated in 1952. Sann became a member of the New York bar, and in 1955 he joined the law firm of Mitchell, Capron.  In 1960 he joined the law firm of Debevoise & Plimpton.  Sann left Debevoise & Plimpton in 1970 and, with Edwin Howe, formed the law firm of Sann & Howe.  He remained a name partner at Sann & Howe until 1993.

Sann specializes in international law.  He advises foreign individuals and entities regarding investments in the United States.  Among his clients for many years have been Royal Dutch Shell in the Hague and Shell Transport and Trading in London. Together these two companies own the worldwide group of Shell companies.  Sann has counseled executives of the two companies with respect to investments in the United States for their corporate pension funds.  On a personal level, Sann has invested in the stock market, securities, mutual funds, investment partnerships, and real estate.  Sann approaches each of his personal investments "separately and individually, depending on the nature of the investment."

In 1981, Sann acquired an indirect, limited partnership interest in Empire with a $43,750 investment in S&H Empire, and an indirect limited partnership interest in Plymouth with a $50,000 investment in Plymouth Partners.  In 1982, he acquired an

indirect, limited partnership interest in Foam with a $50,000 investment in Jabrilach Recycling.

As a result of Sann's indirect investments in Empire and Plymouth, on their 1981 Federal income tax return Sann and his wife Marianne claimed operating losses in the respective amounts of $31,520 and $35,636, and investment tax and business energy credits totaling $156,900.[7] The Sanns also claimed operating losses from Empire and Plymouth on their 1982 return in the respective amounts of $710 and $1,132. As a result of his indirect investment in Foam, on their 1982 return the Sanns claimed an operating loss in the amount of $35,272 and investment tax and business energy credits totaling $76,767.[8] Respondent disallowed the Sanns' claimed operating losses and credits related to Empire, Plymouth, and Foam in full, except for the operating losses from Empire and Plymouth claimed on their 1982 return. In addition, with respect to Empire, respondent determined a distributive share of income in the amount of $4,375 for 1981.

---

[7]   The Sanns claimed a total of $158,128 in investment credits on their 1981 return. The notice of deficiency indicates that $74,210 of the credits derived from Empire and that $82,690 of the credits derived from Plymouth. The record in docket No. 21518-88 does not indicate the source of the additional $1,228 in credits claimed by the Sanns.

[8]   The total investment credit claimed by the Sanns on their 1982 return was $101,502.

Sann learned of the Plastics Recycling transactions and the Partnerships from Maxfield, who at the time was of counsel at Sann & Howe. The two had been introduced earlier in the year by a mutual friend, and Maxfield had been hired to provide general tax expertise to the firm. Maxfield told Sann that he had heard about the Plastics Recycling transactions from Taggart. Sann had met Taggart a year or so earlier and knew of him as a tax lawyer. Maxfield provided Sann with a copy of an offering memorandum and he reviewed it. By Sann's account, he spent 60 to 70 hours over a 7- to 10-day period studying the offering memorandum.

Sann discussed the transactions with other members of Sann & Howe, including Maxfield, at informal and formal meetings. He queried Taggart, by phone, about his impression of PI and the machines, and Sann testified that Taggart had responded in a positive way. Sann did not know that Taggart was making an investment in the Plastics Recycling transactions. He understood that Wible was impressed with what he had seen on his visit to PI. Sann also spoke to his contacts in the oil business, and he asserts that from them he understood that the consensus was that the price of oil would gradually continue to rise, though at a lower rate than in the past. However, Sann did not consider such speculation to be an ironclad assurance of the direction of the price of oil.

Sann did not investigate PI or any of the entities involved in the Plastics Recycling transactions. He recalled that Roberts

visited Sann & Howe once to speak "to all those who were interested in investing" and that he "answered any questions that anybody might have."  Sann was not overly concerned by the fact that Roberts only had to devote as much time as he felt necessary to the operation of the Partnerships because, as Sann understood the arrangement, PI was going to find the end-users, not the Partnerships, and thus "the real operation, the real work would be done in * * * Hyannis by PI."  Maxfield informed Sann about his visit to PI in 1982.

Sann discussed the price of the recycler with Maxfield, but he denies that Maxfield raised the option of hiring an independent expert or appraiser.  Sann never saw a Sentinel EPE recycler, investigated its value, or investigated any other competing recyclers for a price comparison.  Sann allegedly assumed, and understood from others, that the Sentinel EPE recycler was a unique machine and that it was priced on a take-it-or-leave-it basis.  With respect to the uniqueness of the Sentinel EPE recycler and its purported value, Sann acknowledges that he "relied, indeed, to a large extent, probably too much, on the contents of the offering memorandum and the expert opinions contained in the memorandum."

#### 2.  Laurence M. Addington

Petitioner Laurence M. Addington (Addington) resided in New York, New York, when his petitions were filed.  Addington earned an undergraduate degree from the University of Minnesota in 1958

and a law degree from Yale Law School in 1961.  After service in the Army, Addington moved to New York City and was employed in the trust department of the Morgan Guaranty Trust Company. Approximately 4 or 5 years later, in 1967, he joined the law firm of Breed, Abbott & Morgan and practiced in their trusts and estates department.  In 1973 he joined the law firm of Sann & Howe, and he became a partner in that firm the following year. Addington specializes in estate planning and administration.

In 1981, Addington acquired an indirect, limited partnership interest in Empire with a $25,000 investment in S&H Empire, and an indirect limited partnership interest in Plymouth with a $6,520 investment in Plymouth Partners.  In 1982, he acquired an indirect, limited partnership interest in Foam with a $25,000 investment in Jabrilach Recycling.

As a result of his indirect investments in Empire and Plymouth, on his 1981 Federal income tax return Addington claimed operating losses in the respective amounts of $18,013 and $4,454, and investment tax and business energy credits totaling $53,416.[9] Addington also claimed operating losses from Empire and Plymouth on his 1982 return in the respective amounts of $406 and $141. As a result of his indirect investment in Foam, on his 1982 return Addington claimed an operating loss in the amount of

_____

[9]     The notice of deficiency in docket No. 21519-88 indicates that of the $53,416 in credits, $43,080 derived from Empire ($21,876 in investment tax credits and $21,204 in business energy credits) and $10,336 derived from Plymouth ($5,158 in investment tax and business energy credits each).

$17,637 and an investment tax and business energy credit totaling $35,094.[10]  Respondent disallowed Addington's claimed operating losses and credits related to Empire, Plymouth, and Foam in full, except for the operating losses from Empire and Plymouth claimed on his 1982 return.  In addition, with respect to Empire, respondent determined that Addington had a distributive share of income in the amount of $2,500 for 1981.

Addington learned of the Plastics Recycling transactions and the Partnerships from Maxfield at a firm meeting.  At the meeting, Maxfield briefly described the transactions and made an offering memorandum available for review.  Addington spent approximately 1 hour perusing it.  He did not check the figures in the cash-flow analysis section of the offering memorandum.  Although he was aware of the tax benefits, Addington claims that he had no idea how they were derived.  At trial, Addington could not recall ever having met Roberts.  He could not recall reading that the tax benefits were generated by the purported value of the machine, nor could he recall reading about any potential conflicts of interest.

After reviewing the offering memorandum, Addington spoke to Maxfield.  He understood that Maxfield's investigation had entailed speaking to Roberts and Taggart, and he also was aware

---

[10]    Addington claimed an investment credit totaling $35,498 on his 1982 return.  Of that amount, $35,094 derived from Foam.  The investment tax credit and business energy credit generated by Foam each were in the amount of $19,192.  However, his business energy credit was subject to limitation of $15,902.

of Maxfield's visit to PI in 1982.  Maxfield explained the transactions to Addington in his own words.  The two also discussed PI, the people organizing the Partnerships, and the value of the machine.  Maxfield explained to Addington that an audit would focus on the value of the machine.  Addington understood that Wible had visited PI and that he was impressed by the factory and the machines.  Addington also recalled speaking to Sann about the proposal.  Although he was initially skeptical, Addington felt "more positive" about the investment after speaking with Maxfield and Sann.

Addington never met Roberts or knew anything about him.  He did not believe that the success of the Partnerships depended upon Roberts' personal efforts.  Addington did not know how the Sentinel EPE recycler worked, in a technical sense, and he never saw one or asked to see one.  He did not personally investigate the recyclers or the entities involved in the transactions.  Addington knew that Maxfield's expertise was in taxation, and he had no reason to believe that Maxfield had a background in plastics recycling or engineering.  He recalled that Maxfield did not press anyone to invest in the Plastics Recycling transactions, and Addington never felt like he was being subjected to a hard sell.

### 3.  David M. Cohn

Petitioner David M. Cohn (Cohn) resided in New York, New York, when his petitions were filed.  Cohn earned an

undergraduate degree from Brandeis University and then a law degree from the NYU Law School in 1972.  After law school he worked for 2 ½ years as an associate in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison (Paul, Weiss).  He then was employed for 1 year in the office of general counsel at Macy's.  Cohn returned to Paul, Weiss for another 2 years, and then worked for a year in the asset swap legal division of Bankers Trust.  He joined the law firm of Sann & Howe in approximately 1979 and became a partner in that firm in 1982.  Cohn has specialized in real estate law throughout his career.  At Sann & Howe, he advised foreign investors with respect to joint ventures with developers and investments in office buildings and residential property.  In that role, Cohn was "very involved in * * * whether the deals worked or not."

In 1981, Cohn acquired an indirect, limited partnership interest in Empire through a $6,250 investment in S&H Empire.  In 1982, he acquired an indirect, limited partnership interest in Foam through a $6,000 investment in Jabrilach Recycling.

As a result of his indirect investment in Empire, on his 1981 Federal income tax return Cohn claimed an operating loss in the amount of $4,503 and investment tax and business energy credits totaling $8,156.[11]  Cohn also claimed an operating loss from Empire on his 1982 return in the amount of $101.  As a

_____

[11]    The investment tax and business energy credits flowing from Empire totaled $5,300 each.  However, Cohn's business energy credit for 1981 was subject to a limitation to $2,856.

result of his indirect investment in Foam, on his 1982 return Cohn claimed an operating loss in the amount of $4,232 and investment tax and business energy credits totaling $9,212.[12] Respondent disallowed Cohn's claimed operating losses and credits related to his indirect investments in Empire and Foam in full, except for the operating loss from Empire claimed on his 1982 return. In addition, with respect to Empire, respondent determined that Cohn had a distributive share of income in the amount of $625 for 1981.

Cohn learned of the Plastics Recycling transactions and the Partnerships from Maxfield. He reviewed an offering memorandum for approximately 3 to 4 hours and then questioned Maxfield about it. Cohn considered that the mechanics of the deal "would have been [Maxfield's] strong suit and not mine." He described his

---

[12]     On his 1982 return, Cohn claimed a total investment credit in the amount of $13,401. In his petition, Cohn asserts that his distributive share of Jabrilach Recycling's investment tax credit through Foam was $13,401.
    However, Cohn's 1982 Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., attached to Jabrilach Recycling's 1982 Form 1065, indicates that Cohn's share of basis in the recyclers owned by Foam was $46,060. Accordingly, the total investment tax and business energy credits available to Cohn from his indirect interest in Foam was $9,212 ($4,606 each).
    Cohn's 1982 return indicates that the additional $4,189 in credits was comprised of $745 in investment tax credits from other qualifying property, and carried over business energy credits in the amount of $3,444. It is unclear from his 1982 return how much, if any, of the carried over business energy credits was from Empire. Respondent disallowed Cohn's claimed credits in full.

understanding of how the value of the machines was determined as follows:

> It was explained to me [by Maxfield]. How much I understood about it I don't know, but I didn't know how it got this valuation, how we got to this valuation, and it was explained to me that, under this provision, you could do this, and this provision, you could do that.
>
> * * * * * * *
>
> As to the overall valuation, it didn't--I don't think I questioned it, because to me the valuation was based upon the projections of profit, that if you could get this kind of profit out, the[n] a unique machine, which is what I thought we were investing in, was worth whatever they could [get] for it. So, I didn't analyze the nuts and bolts of each machine.

Cohn understood that the potential economic returns were dependent upon the price of oil. He spoke to Sann about the price of oil after Sann had spoken to his contacts in the oil business.

Cohn spent approximately 10 to 12 hours discussing the investment with Maxfield, as well as Sann, Addington, Wible, and Chuck Kellert (Kellert), another partner at Sann & Howe. He also attended some of the firm meetings regarding the investment. Cohn understood that Maxfield was satisfied with the offering memorandum and tax opinion, but he could not recall Maxfield mentioning the option of hiring an independent appraiser or expert. He recalled that Wible spoke approvingly of his visit to PI and that the others thought positively about the investment. Cohn could not recall meeting Roberts. He understood that he could expect to receive profits from the royalties in accordance with the timetable set out in the offering memorandum.

Cohn questioned Maxfield about the status of his 1981 investment when no profits were forthcoming. Cohn recalled that the progress reports he had seen "did not look great and scared * * * [him] a little bit." Maxfield's "responses were not euphoric but good enough [for Cohn] to invest again in 1982." Even though he had yet to receive any distributions from Empire, Cohn invested in Foam in 1982. Cohn testified that Maxfield spoke positively about his visit to PI that year. Cohn recalled that "much further investigation" had been undertaken and that "Explanations were given as to why the [projected economic] return [for Empire] had not come forth." Other than perhaps Maxfield's visit to PI, however, Cohn did not elaborate upon what "further investigation" had been done. The explanation he received with respect to Empire's lack of economic return was that "the market was weak at that--for those few months".

Cohn thought that the plastics recycling business "was just slow" until he read an article in the Wall Street Journal reporting that "there was an injunction * * * restraining Mr. Roberts from pushing these things." At that point Cohn recalled that discussions at Sann & Howe "focused on the fact that we had dealt with a promoter who had not--that we had been sold a bill of goods is the best way I can put it." Cohn recalled that there was a feeling that the investment did not produce as projected, "And personally, you know, how could I or how could we be so stupid as to--and then we would go through what--the recollection

of what more could we have done, but it certainly was mea culpa time."

OPINION

We have decided a large number of the Plastics Recycling group of cases.[13]  The majority of these cases, like the present

---

[13]    Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.

The following cases concerned the addition to tax for negligence, inter alia:  Estate of Hogard v. Commissioner, T.C. Memo. 1997-174; Henry v. Commissioner, T.C. Memo. 1997-86; Skyrms v. Commissioner, T.C. Memo. 1997-69; Friedman v. Commissioner, T.C. Memo. 1996-558; Becker v. Commissioner, T.C. Memo. 1996-538; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398; Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v. Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner, T.C. Memo. 1995-180.

Greene v. Commissioner, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8).  Trost v. Commissioner, 95 T.C. 560 (1990), concerned a jurisdictional issue.

Farrell v. Commissioner, T.C. Memo. 1996-295; Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; Madison Recycling Associates v. Commissioner,

(continued...)

cases, raised issues regarding additions to tax for negligence and valuation overstatement. We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues, although procedural rulings have involved many more favorable results for taxpayers.[14]

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-

_____

[13](...continued)
T.C. Memo. 1992-605, concerned other issues.

[14]     In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held the taxpayers liable for the sec. 6659 addition to tax, but not liable for the negligence additions to tax under sec. 6653(a). As indicated in our opinion, the Zidanich case, and the Steinberg case consolidated with it for opinion, involved exceptional circumstances.
     In Estate of Satin v. Commissioner, supra, and Fisher v. Commissioner, supra, after the decision in Provizer v. Commissioner, supra, the taxpayers were allowed to elect to accept a beneficial settlement because of exceptional circumstances. In Farrell v. Commissioner, supra, we rejected the taxpayers' claim to a similar belated settlement arrangement since the circumstances were different and the taxpayers previously had rejected settlement and elected to litigate the case. See also Baratelli v. Commissioner, supra; Zenkel v. Commissioner, T.C. Memo. 1996-398.

motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that their investments in the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in these cases, and the Sentinel EPE recyclers purportedly leased by the Partnerships, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the stipulations of settled issues filed shortly before trial. The records plainly support respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A.  Statute of Limitations

Petitioners contend that the section 6229(a) period of limitations for assessing their partnership items for the 1982 tax year expired on June 30, 1987, several years before respondent issued the respective notices of deficiency for 1982.[15]

In general, section 6229(a) provides that the period for assessing any income tax attributable to partnership items (or affected items) for a partnership taxable year will not expire until the later of a date which is 3 years after the partnership files its information return for the taxable year in question or the last day for filing such return for such year (without extensions).  This minimum 3-year period may be extended, suspended, or otherwise modified as provided elsewhere in section 6229.  The relevant modifications with respect to petitioners' cases are in subsections (b), (d), and (f) of section 6229.

Section 6229(b) provides as follows:

(b) EXTENSION BY AGREEMENT.-

(1) IN GENERAL.-The period described in subsection (a) (including an extension period under this subsection) may be extended-

(A) with respect to any partner, by an agreement entered into by the Secretary and such partner, and

(B) with respect to all partners, by an agreement entered into by the Secretary and

---

[15]    The parties do not dispute that resolution of this issue is governed by the TEFRA partnership provisions, secs. 6221-6233.

the tax matters partner (or any other person
authorized by the partnership in writing to
enter into such an agreement),

before the expiration of such period.

(2) COORDINATION WITH SECTION 6501(c)(4).--Any
agreement under section 6501(c)(4) shall apply with
respect to the period described in subsection (a) only
if the agreement expressly provides that such agreement
applies to tax attributable to partnership items.

Section 6229(d) provides that the running of the limitations
period is suspended from the date when the notice of Final
Partnership Administrative Adjustment (FPAA) is mailed to the
partnership's TMP for (1) the period during which an action may
be brought for judicial review of the FPAA, and if such an action
is brought, until the decision of the court becomes final, and
(2) for 1 year thereafter. The period during which an action may
be brought is generally 150 days. Sec. 6226(a) and (b); see sec.
7503.

Section 6229(f) provides that if partnership items become
nonpartnership items before the expiration of the limitations
period otherwise provided, then the limitations period shall not
expire before the date that is 1 year after the date on which
partnership items become nonpartnership items.

Foam filed its partnership return for the 1982 tax year on
March 16, 1983. Therefore, the limitations period was initially
set to expire on April 15, 1986. Sec. 6229(a). However, on
November 5, 1985, one of the attorneys-in-fact for Foam, Shaye
Jacobson (Jacobson), executed a Form 872-P, Consent to Extend the

Time to Assess Tax Attributable to Items of a Partnership, with respect to Foam's 1982 tax year.[16]  Petitioners concede that this consent extended the period of limitations for assessment of partnership items for all partners of Foam to June 30, 1987.

Prior to June 30, 1987, petitioners executed extensions of time for assessment (the Consents) with respect to their 1982 tax years.[17]  Cohn (or on Cohn's behalf his authorized representative, Bernard L. Dikman (Dikman), C.P.A.) executed a series of 3 Forms 872, Consent to Extend the Time to Assess Tax. The first was executed on February 26, 1986, and extended the limitations period until June 30, 1987.  The second was executed on March 6, 1987, and extended the limitations period until December 31, 1988.  The third was executed on February 12, 1988, and extended the limitations period until December 31, 1989.

Addington and the Sanns executed Forms 872-A, Special Consent to Extend the Time to Assess Tax, on December 22, 1985 and March 13, 1986, respectively.  Each of the Forms 872-A extended the period of limitations until the 90th day after (1) the IRS office considering the case received a Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer; (2) the IRS mailed a Form 872-T to the

---

[16]    A member of Freedman & Co., Jacobson had been named an attorney-in-fact for Foam Recycling, along with Freedman, in a Form 2848, Power and Declaration of Representative, executed by Roberts on Apr. 2, 1984.

[17]    The records in these cases indicate, and the parties do not dispute, that petitioners timely executed their respective Consents in accordance with sec. 6501(c)(4).

taxpayer; or (3) the IRS mailed a notice of deficiency to the taxpayer.  On November 21, 1989, Addington and the Sanns, through their counsel, executed Forms 872-T for the purpose of terminating the Forms 872-A.  The Forms 872-T were received by the IRS on November 27, 1989.  The 90th day after November 27, 1989 was February 25, 1990.

On December 20, 1989, a Notice of Beginning of Administrative Proceedings (NBAP) with respect to Foam's 1982 tax year was issued to Foam's TMP and to each of petitioners.  One day later, on December 21, 1989, an FPAA with respect to Foam's 1982 tax year was issued to Foam's TMP and to each of petitioners.  Under section 6229(d), the issuance of the FPAA operated to suspend the period of limitations until May 20, 1991.  In addition, because the NBAP and FPAA were issued within 120 days of each other, petitioners had the option to elect to have their partnership items treated as nonpartnership items.  Sec. 6223(e).  On January 31, 1990, petitioners, through their respective counsel, so elected.

The consequences of petitioners' elections to treat their partnership items as nonpartnership items were twofold.  First, petitioners no longer could petition for, or be treated as parties to, any judicial review of the FPAA.  Secs. 6226(d)(1)(A) and (d)(2), 6231(b)(1)(D), 6223(e)(3)(B).  Second, under section 6229(f), the limitations periods with respect to petitioners' former partnership items could not expire less than 1 year later, or January 31, 1991.  Respondent issued the 1982 notices of

deficiency at issue in these cases to petitioners on July 19 and 20, 1990.[18]

Petitioners argue that the Consents were not effective to extend respondent's time to make the adjustments at the partnership level to which any deficiency or addition to tax could be attributed. We disagree.

Section 6229(b)(2) provides that any agreement under section 6501(c)(4) shall apply with respect to the limitations period described in subsection (a) only if such agreement expressly provides that such agreement applies to tax attributable to partnership items. The Forms 872-A executed by the Sanns and Addington contained the following restrictive language:

> (5) The amount of any deficiency assessment is to be limited to that resulting from any adjustments to (a) items affected by the carryover or continuing tax effect caused by adjustments to any prior tax return; (b) the taxpayer's distributive share of any item of income, gain, loss, deduction, or credit of, or distribution from
>
> JABRILACH RECYCLING #13-3133726
>
> (c) the tax basis of the taxpayer's interest(s) in the aforementioned partnership(s) or organization(s) treated by the taxpayer(s) as a partnership; and (d); any gain or loss (or the character or timing thereof) realized upon the sale or exchange, abandonment, or other disposition of taxpayer's interest in such partnership(s) or organization(s) treated by the taxpayer as a partnership; including any consequential changes to other items based on such adjustment.

---

[18] The notices of deficiency for the 1982 tax year were issued to Addington and the Sanns on July 19, 1990, and to Cohn on July 20, 1990.

Of the 3 Forms 872 executed by or on behalf of Cohn, the first contained no such language.  However, the second contained similar restrictive language, and the third incorporated such language by reference.

In Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645, this Court found that an extension agreement containing restrictive language virtually identical to that in petitioners' Consents satisfied the requirements of section 6229(b)(2).  Cohn argues that in his case, the first Form 872 executed on his behalf did not satisfy section 6229(b)(2), and that the limitations period under section 6229(a) expired before he executed the second Form 872 on March 6, 1987.  However, as Cohn conceded, the period of limitations under section 6229(a) had been validly extended by Jacobson until June 30, 1987.  Therefore, the limitations period on assessment for 1982 was still open when Cohn executed the second Form 872 on March 6, 1987.

Section 6229(b)(1) provides that the period of limitations for assessing partnership items (or affected items) may be extended before the expiration of such period.  Subparagraphs (A) and (B) of section 6229(b)(1) define by whom and for whom the period of limitations may be extended.  Petitioners concede that, pursuant to the authority provided under section 6229(b)(1)(B), the Form 872-A executed by Jacobson extended the time for making adjustments at the partnership level with respect to all partners until June 30, 1987.  Likewise, the Consents executed by

petitioners, pursuant to the authority provided under section 6229(b)(1)(A), also extended the time for making adjustments at the partnership level, but only with respect to petitioners' partnership items (or affected items) for taxable year 1982.

The respective Consents executed by petitioners were executed prior to the expiration of the section 6229(a) period of limitations on assessment for 1982, as extended by Jacobson for all partners, and such Consents were sufficient to satisfy section 6229(b)(2). See Foam Recycling Associates v. Commissioner, supra. We hold that the period of limitations for assessment of tax related to petitioners' former partnership items (or affected items) for 1982 under section 6229(a) had not yet expired when respondent issued the notices of deficiency for docket Nos. 21209-90, 22399-90, and 22466-90. Respondent is sustained on this issue.

B. Section 6653(a)--Negligence

In notices of deficiency for 1981 and 1982, respondent determined that each of petitioners was liable for the additions to tax for negligence under section 6653(a)(1) and (2). Petitioners have the burden of proving that respondent's determinations of these additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax

is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-341 with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners argue that they were reasonable in claiming deductions and credits with respect to the Partnerships. They maintain that they reviewed the offering memoranda, expected an economic profit in light of the so-called oil crisis in the United States in 1981, and that they reasonably relied upon Maxfield as a qualified adviser on this matter.

## 1. The Private Offering Memoranda

Petitioners each testified that they reviewed a copy of at least one of the respective offering memoranda.[19] Sann claims that he spent 60 to 70 hours over a 7 to 10 day period studying one. Addington recalls spending approximately 1 hour perusing one. Cohn recalls that he spent 3 to 4 hours reviewing one. Regardless of how much time petitioners may have devoted to the offering memoranda, however, the records in these cases reveal that they did not give due consideration to all of the information set out therein, and that they did not pay sufficient heed to the warnings and caveats contained therein.

The projected first-year tax benefits in each of the offering memoranda exceeded petitioners' respective investments. For each $50,000 investor, the projected first-year tax benefits for the Partnerships were as follows:

---

[19] It is not clear from the records in these cases whether petitioners reviewed all three offering memoranda or just the offering memorandum for Empire or Plymouth.

The offering memoranda and accompanying tax opinions for the partnerships are substantially similar. WMDI prepared the offering memoranda and tax opinions for Empire and Plymouth. The law firm of Boylan & Evans prepared the tax opinion for Foam. The two name partners of Boylan & Evans, William A. Boylan and John D. Evans, were partners at WMDI during 1981, but left to form their own firm in 1982.

The offering memoranda for Empire and Plymouth were included in the records for docket Nos. 21518-88 and 21519-88 (the Sann and Addington cases for 1981). Because Cohn did not invest in Plymouth, only the Empire offering memorandum was included in the record for his 1981 case, docket No. 4789-89.

|  | IT and BE Credits | Deductions |
|---|---|---|
| Empire | $84,813 | $40,650 |
| Plymouth | 82,639 | 40,376 |
| Foam | 76,736 | 39,878 |

With respect to their combined indirect investments in Empire and Plymouth, petitioners claimed the following total tax benefits on their 1981 Federal income tax returns.[20]

|  | Total Combined Investment | IT and BE Credits | Loss |
|---|---|---|---|
| Sann | $93,750 | $156,900 | $67,156 |
| Addington | 31,520 | 53,416 | 22,467 |
| Cohn | 6,250 | 8,156 | 4,503 |

With respect to their indirect investments in Foam, petitioners claimed the following tax benefits on their 1982 Federal income tax returns.

|  | Investment | IT and BE Credits | Loss |
|---|---|---|---|
| Sann | $50,000 | $76,767 | $35,272 |
| Addington | 25,000 | 35,094 | 17,637 |
| Cohn | 6,000 | 9,212 | 4,232 |

The total of investment tax and business energy credits ostensibly generated by the Partnerships and available to petitioners was more than 1 ½ times their cash investments. Therefore, after adjustments of withholding, estimated tax, or final payment, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the * * * [Partnership transactions]." In view of the disproportionately large tax benefits claimed on petitioners' Federal income tax returns,

---

[20]    As noted, Cohn invested in S&H Empire but not in Plymouth Partners.

relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required.

The offering memoranda raised numerous caveats and warnings with respect to the Partnerships, including: (1) The Partnerships had no operating history; (2) management of the Partnerships' business was dependent upon the general partner, who had no experience in marketing recycling equipment and who was required to devote only such time to the Partnerships as he deemed necessary; (3) the limited partners had no right to take part in, or interfere in any manner with, the management or conduct of the business of the Partnerships; (4) there was no established market for the Sentinel recyclers; (5) although competitors were purportedly not marketing comparable equipment, and the Sentinel recyclers purportedly involved "carefully guarded trade secrets," PI did "not intend to apply for a patent for protection against appropriation and use by others." The Foam offering memorandum also noted "that since August 1981, PI [had] become a sublicensee of 104 other Sentinel Recyclers" and had "encountered longer start-up periods than anticipated". A careful consideration of the materials in the offering memoranda in these cases, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-

217; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996).

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), is misplaced. In Osterhout, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained the Commissioner's imposition of the negligence additions to tax with respect to one of the partners therein.[21] The Court of Appeals for the Ninth Circuit reversed our imposition of the negligence additions to tax. Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.

In the cases before us, however, petitioners' purported reliance on the tax opinion letters is questionable. The tax opinion letters expressly warned that the investment tax and business energy credits would be reduced or eliminated if the Partnerships could not demonstrate that the price paid for the

---

[21] Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases. The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia. Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

recyclers approximated their fair market value. Neither of the tax opinions purports to rely on any independent confirmation of the fair market value of the recyclers. Rather, the tax opinions refer to representations by PI and/or other entities involved in the transactions for the value of the Sentinel EPE recycler. For example, in the tax opinion appended to the offering memoranda for Empire and Plymouth, WMDI states:

> PI has represented that its pricing policies are a trade secret, but that its price for the Sentinel Recyclers to the company which will sell the machines to the company from which the Partnership will lease them is no less than it would charge any other purchaser.

In the tax opinion appended to the Foam offering memorandum, Boylan & Evans state that "PI, ECI, F & G [Corp.] and the Partnership have represented to us that the prices paid by ECI and F & G [Corp.] * * * were negotiated at arm's length." In fact, as petitioners stipulated, no arm's-length negotiations for the price of the Sentinel EPE recycler took place between or among PI, ECI, and F & G Corp.

The offering memoranda for the Partnerships warned prospective investors that the accompanying tax opinion letters were not in final form and were prepared for the general partner,[22] and that prospective investors "MUST RELY UPON THEIR OWN PROFESSIONAL ADVISERS WITH RESPECT TO THE TAX BENEFITS AND

---

[22]    Each of the offering memoranda notes that the opinion letter of counsel "will be provided to the General Partner for his individual guidance," and that prospective investors "are not permitted to rely upon the advice contained therein."

TAX RISKS RELATING TO AN INVESTMENT IN THE PARTNERSHIP."  The tax opinion letters accompanying the Empire and Plymouth offering memoranda were addressed solely to the general partner and began with the following opening disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>.  <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with their investment in the Partnership and the operations thereof.  We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the purpose in distributing it is</u> to assist your offerees' tax advisors in making their own analysis and <u>not to permit any prospective investor to rely upon our advice in this matter</u>.  [Emphasis added.]

The tax opinion letter accompanying the Foam offering memorandum, addressed solely to Roberts, similarly states:  "[T]his letter is intended for your own individual guidance and for the purpose of assisting prospective purchasers and their tax advisors in making their own analysis, and no prospective purchaser is entitled to rely upon this letter."  Accordingly, the tax opinion letters expressly indicate that prospective investors such as petitioners were not to rely upon the tax opinion letter.  See <u>Collins v. Commissioner</u>, <u>supra</u> at 1386.  The limited, technical opinions of tax counsel expressed in these letters were not designed as advice upon which taxpayers might rely and the opinions of counsel themselves so state.

## 2.  The So-Called Oil Crisis

Petitioners testified that they reasonably expected to make an economic profit from the Partnership transactions because plastic is an oil derivative and the United States was experiencing a so-called oil crisis when they invested in the Partnerships.  Based upon our review of the records, we find petitioners' claims unconvincing, regardless of the so-called oil crisis.  Moreover, persuasive testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and purported losses based on vastly exaggerated valuations of recycling machinery.

Petitioners did not educate themselves in, or personally investigate, the business aspects of the Plastics Recycling transactions.  Nor did they attempt to resolve the numerous business-related caveats and warnings in the offering memoranda. Petitioners purport to have relied on Maxfield, but Maxfield made it clear to all concerned that he was not an investment analyst and that he had no training to decide whether the price of oil was going to increase or decrease.  Maxfield also told the members of Sann & Howe that he considered the relationship between the potential value of the recycled pellets and the price of oil to be a negative aspect of the proposed investment.  In addition, petitioners received progress reports with respect to

Empire that revealed that as late as August 1982, despite the so-called oil crisis, only one of its seven recyclers was actually generating revenue.  Nonetheless, petitioners subsequently invested in Foam, through Jabrilach Recycling, and claim that they expected to receive an economic profit because of the so-called oil crisis.

Moreover, petitioners did not adequately explain how the so-called oil crisis provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits.  The offering materials warned that there could be no assurances that prices for new resin pellets would remain at their then-current level.  One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil.  In his report, he stated that less than 10 percent of crude oil is utilized for making plastics materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products."  Furthermore, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans."  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).  Certainly Cohn, an admitted "news nut", was aware of such media coverage.

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of these cases. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. In the present cases, however, as explained by respondent's expert Steven Grossman, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had or reasonably should have had a substantial bearing on petitioners' decisions to invest. While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis

for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

In addition, the taxpayers in the Krause case were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present cases, petitioners were not experienced or educated in plastics recycling, and they did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions. Although Sann spoke to client contacts in the oil business, he recognized that their opinions about the future price of oil were nothing more than speculation. We consider petitioners' arguments with respect to the Krause case inapplicable.

### 3. Petitioners' Purported Reliance on an Adviser

Petitioners claim that they reasonably relied upon the advice of a qualified adviser, Maxfield.

The concept of negligence and the argument of reliance on an expert are highly fact intensive. Petitioners in these cases are very well educated and sophisticated attorneys. Sann specializes in international law and has advised foreign individuals and

entities with respect to investments in the United States;
Addington specializes in estate planning and administration; and
Cohn specializes in real estate law and has advised foreign
investors with respect to joint ventures and real estate
investments in the United States. These sophisticated attorneys
ultimately relied upon another attorney to investigate the tax
law and the underlying business circumstances of a proposed
investment, the success of which depended upon a purportedly
technologically unique machine. The attorney allegedly relied
upon by petitioners had no expertise in plastics materials or
plastics recycling and stressed to petitioners that he was not an
investment analyst. In the end, he relied upon the offering
materials and persons connected to the transactions for the value
of the machine, and fully disclosed the limitations of his
investigation to petitioners.

### a. The Circumstances Under Which a Taxpayer May Avoid Liability Under Section 6653(a)(1) and (2) Because of Reasonable Reliance on Competent and Fully Informed Professional Advice

A taxpayer may avoid liability for the additions to tax
under section 6653(a)(1) and (2) if he or she reasonably relied
on competent professional advice. United States v. Boyle, 469
U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849,
888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.
868 (1991). However, a taxpayer bears the responsibility for any
negligent errors of his or her professional adviser. See

American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1116-1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958); Buck v. Commissioner, T.C. Memo. 1997-191.  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Buck v. Commissioner, supra; Sacks v. Commissioner, T.C. Memo. 1994-217; Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also, e.g., Friedman v. Commissioner, T.C. Memo. 1996-558; Gollin v. Commissioner, T.C. Memo. 1996-454; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub

nom. <u>Cowles v. Commissioner</u>, 949 F.2d 401 (10th Cir. 1991); <u>Marine v. Commissioner</u>, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); <u>McCrary v. Commissioner</u>, 92 T.C. 827, 850 (1989); <u>Rybak v. Commissioner</u>, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. <u>David v. Commissioner</u>, <u>supra</u>, <u>Goldman v. Commissioner</u>, <u>supra</u>; <u>Freytag v. Commissioner</u>, <u>supra</u>; <u>Beck v. Commissioner</u>, 85 T.C. 557 (1985); <u>Buck v. Commissioner</u>, <u>supra</u>; <u>Lax v. Commissioner</u>, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); <u>Sacks v. Commissioner</u>, <u>supra</u>; <u>Steerman v. Commissioner</u>, T.C. Memo. 1993-447; <u>Rogers v. Commissioner</u>, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited <u>supra</u> note 13.

### b. <u>Maxfield</u>

Maxfield had no education, special qualifications, or professional skills or experience in plastics engineering, plastics recycling, or plastics materials. He did not consider himself to be an investment analyst or an expert in tax shelters. Maxfield never represented to the members of Sann & Howe that he was an expert in plastics recycling or engineering, and he always stressed that he was not an investment analyst. Even during the course of his testimony, in recounting his observations at PI and his understanding of how the machines worked, Maxfield was

careful to preface his recollections by cautioning: "Remember *
* * I'm not a scientist" and "recognizing I'm not an engineer".

Maxfield testified that he spent approximately 50 to 75 or
more hours investigating the Plastics Recycling transactions.
His investigation consisted of reading the offering materials and
speaking with Roberts and Taggart in 1981, and visiting PI's
plant in Hyannis in 1982. He did not consider Taggart to be an
expert in plastics recycling or plastics engineering. Two of
Maxfield's principal concerns with respect to the Partnership
transactions were (1) "what was in it for the promoter", Roberts,
and (2) whether the Partnerships were "paying a fair price" for
the machines.

To learn "what was in it for the promoter", Maxfield spoke
to the promoter, Roberts. Maxfield was concerned about Roberts'
compensation and commitment to the Partnerships because in other
tax shelters he had seen, the promoter sometimes made a
substantial profit regardless of the success of the partnership.
Roberts explained to Maxfield that the source of his profits, as
the promoter, would be from the operation of the partnerships.
Maxfield concluded from his investigation of this issue that "the
general partner had a real economic incentive to make these
things work if he was going to ever sell any more of--of these
things." In contrast, Sann understood that "the real operation,
the real work would be done in * * * Hyannis by PI", not Roberts.

Addington also understood that the success of the Partnerships did not depend upon Roberts' personal efforts.

Maxfield knew that Roberts did not have "the capacity to seek out end-users" for the recyclers.  The offering memoranda warned that the general partner had no prior experience in marketing recycling or similar equipment and that,

>  the Partnership Agreement does not prohibit the General Partner from engaging in any activity whatsoever, including those which may be competitive with the business of the Partnership, and [such] Agreement requires the general partner to devote only such time to the business of the partnership as he, in his absolute discretion, deems necessary * * *

The offering memoranda also noted that Roberts would not be liable to the Partnerships or the limited partners for errors in judgment or other acts or omissions not amounting to fraud or gross negligence.  Roberts' "economic incentive" in the success of the Partnerships, if any, derived from a 1-percent interest in all items of income, gain, deduction, loss, and credit from the Partnerships (for his respective $1,000 contributions).  However, regardless of how the Partnerships fared, Roberts was due to receive a minimum of $97,500, and up to a maximum of $350,000, from the three offerings.

To learn about the Sentinel recyclers, including how they functioned, their potential market, and their fair market value, Maxfield reviewed the offering memoranda and the reports by Ulanoff and Burstein, spoke to Roberts, and visited PI in 1982. One of Maxfield's concerns was whether it "was a hard sell to get

these machines placed".  He was told that it would not be difficult to place the machines because the recyclers imposed little or no cost on end-users and because end-users would be relieved of the financial burden of removing their plastic waste. Maxfield understood that among the criteria required of end-users was the willingness to "spend something--roughly $5,000 or $6,000, if necessary, for the wiring of the machine."

Maxfield allegedly was told by Roberts and Wible in 1981, and persons at PI in 1982, that the Sentinel EPE recycler was unique and had a "tremendous head-start" over its competitors. He claims that he understood that competing recyclers were not as efficient as the Sentinel EPE recyclers and were not easily placed with end-users.  However, despite the purported technological edge PI supposedly enjoyed over its competitors, the offering memoranda warned that "PI does not intend to apply for a patent for protection against appropriation and use [of its trade secrets] by others."  In addition, the Sentinel recyclers were not unique.  By 1981, several machines capable of densifying low density materials such as polyethylene and polystyrene were already on the market, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator.  In contrast to the Sentinel EPE recycler, which was priced at $1,162,666, these machines ranged in price from $20,000 to $200,000.  See Provizer v. Commissioner, T.C. Memo. 1992-177.

Maxfield testified that he relied on the offering memoranda, and in particular the reports by Ulanoff and Burstein appended thereto, for the value of the recyclers. However, he never spoke to Ulanoff or Burstein and never learned that they were investors in the Plastics Recycling transactions. He did not ask Roberts or Taggart whether Ulanoff and Burstein were investors in the transaction. Although he knew that other plastics recycling machines existed, Maxfield did not run any price comparisons or independently investigate the capabilities of such competing machines. In the end, Maxfield did not confirm the representations in the offering memoranda upon which the purported valuation of the recyclers was based. However, he did caution the members of Sann & Howe on this point. Maxfield testified:

> [O]ne of the fundamental questions I had was is the machine--are we paying a fair price, are we overpaying for this machine?
> Obviously, we could read the offering circular. I was convinced, <u>if the facts were as represented</u>, we weren't overpaying.
> <u>On the other hand, were the--was the offering circular lying? I didn't have any judgment as to that, and I said the only way to know, I suppose, would be to hire another expert</u>. [Emphasis added.]

Despite his express reservations, Maxfield and petitioners did not hire an independent appraiser or expert, or otherwise independently verify the "facts" as represented in the offering memoranda. Reflecting on his own decision to invest, Maxfield testified: "[I]f I would have asked the right questions, I wouldn't have made the investment."

We find that petitioners' purported reliance on Maxfield was not reasonable, not in good faith, nor based upon full disclosure. Maxfield's expertise was in taxation, not plastics materials or plastics recycling. He never represented to anyone at Sann & Howe that he knew anything about plastics recycling or plastics materials, and petitioners never had reason to believe otherwise. In addition, Maxfield never purported to be an expert in tax shelters and stressed that he was not an investment analyst. Maxfield viewed his role in the matter as nothing more than "a conveyor of information and of * * *[his] impressions", and he "made it very clear to each of the potential investors [that it was] their business decision [to make], not * * * [his]."

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases. That circumstance was reflected in the offering memoranda, and Maxfield also explained the tax benefits to petitioners. Accordingly, petitioners learned or should have learned of the nature of the tax benefits from the offering materials or Maxfield or both.[23] However, neither Maxfield, petitioners, nor anyone else at Sann & Howe

---

[23] It is not plausible that such experienced and sophisticated attorneys as petitioners remained ignorant of the nature of the tax benefits. If such was the case, their ignorance could only be explained by (1) their failure to read the offering memoranda, and (2) their failure to listen to Maxfield when he explained the tax benefits to them.

independently confirmed the value of the Sentinel EPE recycler. Maxfield relied on the offering memoranda, and in particular the reports of Ulanoff and Burstein, for the value of the machines. He related this to petitioners and cautioned them that the only way to know if the representations made in the offering memoranda were true would be to hire an independent appraiser or expert.

In the end, petitioners and Maxfield relied on insiders and/or financially interested persons for the value of the Sentinel EPE recyclers and the economic viability of the Partnership transactions. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion." As petitioners knew or certainly should have learned, Maxfield had no education, special qualifications, or professional skills or experience in plastics engineering, plastics recycling, or plastics materials. A taxpayer may rely upon his adviser's expertise, but it is not reasonable or prudent to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, 43 F.3d at 789-790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, T.C. Memo. 1994-217; Rogers v. Commissioner, T.C. Memo. 1990-619.

4. Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and up to the end of 1982 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler's having a value of $1,162,666. In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the Fall of 1981.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. In one

preliminary report, Carmagnola states that he has "a serious concern of actual profit" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose. There is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, counsel for petitioners obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns. Not surprisingly, petitioners' counsel did not call Carmagnola to testify in these cases, but preferred instead to rely solely upon his preliminary, ill-founded valuation estimates. (Carmagnola has not been called to testify in any of the Plastics Recycling cases before us). The Carmagnola reports were a part of the record considered by this Court and reviewed by the Court of Appeals for the Sixth Circuit in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are

unreliable and of no consequence.  Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners submitted into the records of their cases a group of reports or updates as evidence that they monitored their investments in the Partnerships.  A computer printout dated May 7, 1982, indicated that each of Empire's seven recyclers had been shipped to various end-users.  Subsequent computer printouts, dated August 20 and September 30, 1982, indicated that only four machines were running and, contrary to the earlier printout, one machine had not been shipped.  In a letter to Roberts dated February 18, 1983, Bambara explained that "market prices for polyethylene resin have remained relatively low" and "operations of the machines * * * have not been profitable."  Roberts forwarded this letter to the limited partners approximately 2 ½ months later on May 9, 1983.  Also, a review of the accounting procedures relating to the recycling operations conducted by a certified public accounting firm is among the documents submitted into the records in these cases by petitioners.

These documents do not convince us that petitioners closely monitored their investments in the Partnerships.  Roberts forwarded the August 10, 1982 computer printout to petitioners on August 25, 1982, several weeks before Foam closed.  It indicated that no recycled material had been collected from three of the

four machines in operation.  Two other machines, which had been shipped to their respective end-users at least 3 months earlier had not yet been hooked up.  Although an end-user apparently had been awaiting Empire's last recycler for at least 3 months, as indicated by the May 7 and August 10 printouts, the recycler had not yet been shipped.  The information in the August 10 update and the other progress reports submitted by petitioners raised serious questions with respect to the demand for the Sentinel EPE recyclers, the demand for recycled plastic pellets, and the responsiveness of PI.  Nonetheless, petitioners all invested in Foam, through Jabrilach Recycling, in 1982 without further investigation.  Petitioners have failed to establish that they monitored their investments closely.  They cannot reasonably be relieved of the negligence additions to tax on the ground of alleged attentiveness to their investments as they have not established such attentiveness, either before or after they made the investments.

Petitioners cite a number of cases in support of their positions, but primarily rely on Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228; Anderson v. Commissioner, 62 F.3d 1266 (10th Cir. 1995), affg. T.C. Memo. 1993-607; Mollen v. United States, 72 AFTR 2d 93-6443,

93-2 USTC par. 50,585 (D. Ariz. 1993); Daoust v. Commissioner, T.C. Memo. 1994-203; and Davis v. Commissioner, T.C. Memo. 1989-607.

This Court rejected the negligence additions to tax in the Davis and Daoust cases for reasons inapposite to the facts of petitioners' cases. The taxpayers in the Davis case reasonably relied upon a "trusted and long-term adviser" who was independent of the investment venture, and the offering materials reviewed by the taxpayers did not reflect that the principals in the venture lacked experience in the pertinent line of business. In contrast, petitioners purport to have relied on Maxfield, a recently hired colleague contemplating a similar investment. Maxfield acted as a conveyor of information and of his impressions, not as an adviser with expertise in plastics recycling, and he made it clear to petitioners and others at Sann & Howe that it was each individual's own business decision to make, not his. In addition, the offering memoranda warned that the Partnerships had no prior operating history and that the general partner had no prior experience in marketing recycling or similar equipment.

The Daoust case involved a cattle breeding venture that this Court had previously held lacked economic substance and a business purpose. See Rasmussen v. Commissioner, T.C. Memo. 1992-212 (where we also held the taxpayers negligent because, inter alia, they relied solely on representations made in the

offering memorandum and persons having a financial connection with the investment).  In the Daoust case, we declined to sustain the negligence additions to tax because the taxpayer husband, whose family had some history in farming, reasonably relied upon the advice of two qualified independent investment advisers and an independent certified public accountant, who also was the taxpayer husband's brother.  In the cases before us, petitioners relied on Maxfield, who disclosed that he relied on the offering materials and persons connected to the investments for the value of the machines and economic viability of the Partnership transactions.  We find that the facts of petitioners' cases more closely resemble the facts in the Rasmussen case than the Daoust case.  Petitioners' reliance on the Davis and Daoust cases is misplaced.

In Mollen, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals.  The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in the production, marketing, and distribution of medical educational video tapes. The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable.  Although the taxpayer was not experienced in business or tax matters, he did

consult with an accountant and a tax lawyer regarding those matters. Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable." Id. at 93-6447, 93-2 USTC par. 50,585, at 89,895; see Zfass v. Commissioner, T.C. Memo. 1996-167.

In contrast, petitioners in these cases did not have any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable. Although Sann spoke to client contacts in the oil business about the price of oil, he understood that they could only speculate about the direction of the price of oil. Moreover, petitioners' purported adviser, Maxfield, advised the members of Sann & Howe that the relationship between the price of the recycled pellets and the price of oil was a negative aspect of the investment. Petitioners and Maxfield relied upon the offering materials and persons with an interest in the Plastics Recycling transactions. Accordingly, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

Petitioners' arguments are not supported by Anderson v. Commissioner, supra, where the taxpayers were found liable for the negligence additions to tax. In Anderson, the taxpayers claimed tax benefits based upon their acquisition of property listed at $124,500, for which they actually paid $6,225 in a cash

downpayment (5 percent of the purchase price) plus a 5-year financing arrangement. Had the acquisition been nothing more than a $6,225 passive investment in an ongoing business, noted the Court of Appeals, it would have been reasonable for the taxpayers to rely on the advice of a good friend who had thoroughly investigated the investment.[24] However, because the transaction was structured and represented as a purchase in the amount of $124,500, the Court of Appeals held that something more was required.

In the cases before us, petitioners claimed tax benefits based on the assumption that they owned and leased, through the Partnerships, an interest in $20,927,988[25] worth of recycling machines in 1981 and 1982. Based on total investments ranging from $6,250 to $93,750 in 1981 alone, petitioners each claimed qualified investments in new investment credit property with bases ranging from $52,997 to $784,496.[26] These inflated bases generated claims to first-year tax credits in 1981 ranging from $8,156 to $156,900, and claims to deductible losses ranging from

---

[24] The adviser had his accountant and attorney review and check out the structure of the investment; he spoke with the investment principal; he looked into the principal's background and checked out his references, banks, other business connections, and the Better Business Bureau; and he spoke with competitors to make sure the venture was viable.

[25] Eighteen recyclers (4 owned by Foam, 7 each by Empire and Plymouth) each valued at $1,162,666 totals $20,927,988.

[26] The basis figures were derived from petitioners' 1981 Forms 3468, Schedule B, Computation of Business Energy Investment Credit.

$4,503 to $67,156.  Clearly these were substantial transactions requiring careful investigation under the Anderson case.  Unlike the adviser in Anderson, neither Maxfield nor petitioners thoroughly investigated or educated themselves in the industry of the proposed investment.  In view of the substantial basis claimed for the interest of each petitioner in the machinery (in each case a substantial amount greater than the cash invested), from which the investment credits stemmed, plainly something more was required.  Accordingly, we consider petitioners' reliance on the Anderson case inappropriate.

Petitioners' reliance on the Durrett and Chamberlain cases is also misplaced.  In those cases, the Court of Appeals for the Fifth Circuit reversed this Court's imposition of the negligence additions to tax in two nonplastics recycling cases.  The taxpayers in the Durrett and Chamberlain cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts.  In the Durrett and Chamberlain cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters.  In other First Western cases, however, the Courts of Appeals have affirmed decisions of this Court imposing negligence additions to tax. See Foulds v. Commissioner, T.C. Memo. 1994-489 (the well-educated taxpayer failed to establish the substance of advice, and the purported adviser lacked tax expertise), affd. without

published opinion 94 F.3d 651 (9th Cir. 1996); Chakales v. Commissioner, T.C. Memo. 1994-408 (reliance on long-term adviser, who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430 (reliance on adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Freytag v. Commissioner, 89 T.C. at 849 (reliance on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions).

The records in the cases before us fail to establish that Maxfield possessed sufficient knowledge of the plastics or recycling industries to render a competent opinion.[27]  This fact has been deemed relevant by the Court of Appeals for the Second Circuit, the court to which appeal in these cases lies.  See David v. Commissioner, 43 F.3d at 789-790 (taxpayers' reliance on expert advice not reasonable where expert lacks knowledge of

---

[27]    As explained in more detail above, Maxfield relied upon the representations in the offering memoranda and the reports of Ulanoff and Burstein for the value of the Sentinel EPE recycler, which generated the tax benefits in these cases.  He did not independently confirm such representations and, recognizing this, told the members of Sann & Howe that the only way to confirm the fair market value of a Sentinel recycler would be to hire an independent expert or appraiser.

business in which taxpayers invested); <u>Goldman v. Commissioner</u>, 39 F.3d at 408 (same).  Accordingly, petitioners will not be relieved of the negligence additions to tax based upon the decisions in the <u>Durrett</u> and <u>Chamberlain</u> cases by the Court of Appeals for the Fifth Circuit.[28]

## 5.  Conclusion as to Negligence

Under the circumstances of these consolidated cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their Federal income tax returns.  It was not reasonable for petitioners to rely on the offering memoranda, insiders to the transactions, or Maxfield.  Maxfield acted as a conveyor of information and of his impressions, not an investment analyst, and he stressed that the decision to invest rested with each individual and not with him.  He explained the tax benefits to petitioners, although these benefits also were clearly explained in the offering memoranda.  Maxfield disclosed that he was relying on the offering materials for the value of the Sentinel EPE recycler, and that he did not know whether the representations therein were true.  He mentioned that the only way to confirm the purported value of the recyclers was to hire

_____

[28]     Other cases cited by petitioners are inapplicable and distinguishable for the following general, nonexclusive reasons: (1) They involve far less sophisticated, if not unsophisticated, taxpayers; (2) the reasonableness of the respective taxpayers' reliance on expert advice was established in those cases on grounds that do not exist here; and (3) the advice given was within the adviser's area of expertise.

an independent appraiser or expert, but his suggestion went unheeded.

Sann acknowledged that he relied "to a large extent, probably too much, on the contents of the offering memorandum and the expert opinions" appended thereto. Addington did little more than discuss the investment with Maxfield. Cohn reviewed the offering materials and spoke with others at Sann & Howe. Petitioners and Maxfield did not in good faith investigate the fair market value of a Sentinel EPE recycler, or the underlying viability, financial structure, and economics of the Partnership transactions. Their reliance on the offering materials and interested persons was not reasonable. In Cohn's words, "how could we be so stupid * * * it certainly was mea culpa time." We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2) for the taxable years at issue. Respondent is sustained on this issue.

## C. Section 6659--Valuation Overstatement

In all six notices of deficiency, respondent determined that petitioners were liable for the section 6659 addition to tax on the portions of their respective underpayments attributable to valuation overstatement. Petitioners have the burden of proving that respondent's determinations of the section 6659 additions to tax in their cases are erroneous. Rule 142(a); <u>Luman v. Commissioner</u>, 79 T.C. at 860-861.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits and business energy credits, based on purported values of $1,162,666 for each Sentinel EPE recycler. Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 and up to the end of 1982 was not in excess of $50,000. Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the tax benefits claimed with respect to the Partnerships.

Petitioners contend that section 6659 does not apply in their cases for the following three reasons: (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; (2) petitioners' concessions of the claimed tax benefits preclude imposition of the section 6659 additions to tax; and (3) respondent erroneously failed to waive

the section 6659 additions to tax.  We reject each of these arguments for reasons set forth below.

### 1.  The Grounds For Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See McCrary v. Commissioner, 92 T.C. at 827; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements.  Krause v. Commissioner, 99 T.C. at 178 (citing Todd v. Commissioner, supra).  However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (the section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement. According to petitioners, the tax benefits were disallowed

because the Partnership transactions lacked economic substance, not because of any valuation overstatements. It follows, petitioners reason, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiencies. Petitioners cite the following cases to support this argument: Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra; and Todd v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding herein that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Petitioners argue that in Provizer v. Commissioner, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation reported in that case. According to petitioners, the purported

value of the recyclers in the Clearwater transaction was predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayer's valuation method. Petitioners misread and distort our Provizer opinion. In the Provizer case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Likewise, overvaluation of the Sentinel EPE recyclers in these cases is the ground for our holding herein that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was recently rejected in Gilman v. Commissioner, supra, by the Court of Appeals for the Second Circuit, the court to which appeal in these cases would lie. See Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance. The taxpayers therein, citing Todd v. Commissioner, supra, and Heasley v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation. The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment

contributed directly to this Court's earlier conclusion that the transaction lacked economic substance and was a sham. Gilman v. Commissioner, supra at 151. In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'" Gilman v. Commissioner, supra at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. at 566-567; Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, supra, Todd v. Commissioner, 89 T.C. 912 (1987), and McCrary v. Commissioner, 92 T.C. at 827, is misplaced. In those cases, in contrast to the consolidated cases herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in

each of those cases, the overvaluations were not the grounds on which the taxpayers' liability was sustained.  In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item."  McCrary v. Commissioner, supra at 859.  Petitioners' cases present just such a "different situation":  overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and our holding that the Partnership transactions lacked economic substance.[29]

## 2.  Concession of the Deficiency

Petitioners argue that their concessions of the deficiencies preclude imposition of the section 6659 additions to tax. Petitioners contend that their concessions render any inquiry into the grounds for such deficiencies moot.  Absent such inquiry, petitioners argue that it cannot be known if their underpayments were attributable to a valuation overstatement or other discrepancy.  Without a finding that a valuation

---

[29]    To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable.  To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed.  See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement"), affg. T.C. Memo. 1989-684.

overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply.  In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), and McCrary v. Commissioner, supra.

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers.  This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties."  See McCrary v. Commissioner, supra at 854 n.14.  The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties.  As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the Partnership transactions lacked economic substance.  Regardless of petitioners' concessions, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax.  See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630.  Instead, the ground upon which the investment tax credit is disallowed or conceded is significant.  Dybsand v. Commissioner, supra.  Even

in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax.  Gainer v. Commissioner, 893 F.2d at 228; Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the claimed investment tax credits and other tax benefits related to anything other than a valuation overstatement.  To the contrary, petitioners each stipulated substantially the same facts concerning the Partnership transactions as we found in Provizer v. Commissioner, supra.  In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers.  The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance.  Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Petitioners reliance on McCrary v. Commissioner, supra, is misplaced. In that case, the taxpayers conceded disentitlement to their claimed tax benefits and the section 6659 addition to tax was held inapplicable. However, the taxpayers' concession of the claimed tax benefits, in and of itself, did not preclude imposition of the section 6659 addition to tax. In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease. In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers. We hold that petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[30]

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in Provizer that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the Partnership transactions were similar to the Clearwater transaction described in the Provizer case, and that the fair

---

[30] Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate. That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession. Moreover, see supra note 29 to the effect that the Court of Appeals for the Second Circuit and this Court have not followed the Heasley opinion with respect to the application of sec. 6659.

market value of a Sentinel EPE recycler in 1981 and up to the end of 1982 was not in excess of $50,000.  Given those concessions, and the fact that the records here plainly show that the overvaluations of the recyclers was the only reason for the disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

    3.  Section 6659(e)

    Petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax.  Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. at 179.  Abuse of discretion has been found in situations where respondent's refusal to exercise such discretion is arbitrary, capricious, or unreasonable.  See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

    We note initially that petitioners did not request respondent to waive the section 6659 additions to tax until well after the trials of these cases.  Petitioners each made their

requests approximately 4 months after the trials of their cases. We are reluctant to find that respondent abused discretion in these cases when respondent was not timely requested to exercise it and there is no direct evidence of any abuse of administrative discretion. Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request waivers but instead, we have considered the issue on its merits. Petitioners urge that they relied on the offering materials and Maxfield in deciding on the valuation claimed on their tax returns. Petitioners contend that such reliance was reasonable and, therefore, that respondent should have waived the section 6659 additions to tax. However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioners' purported reliance on the offering materials and on Maxfield, with respect to matters outside his area of expertise, was not reasonable.

To varying degrees, each of petitioners reviewed at least one of the offering memoranda for the Partnerships, each of which contained numerous warnings and caveats, including the likelihood that the value placed on the recyclers would be challenged by the IRS as being in excess of fair market value. Petitioners could not have failed to learn from either the offering materials or Maxfield that the purported value of the Sentinel EPE recycler

generated the tax benefits in these cases.  Maxfield testified that he explained the tax benefits to petitioners and warned them that he was relying upon the offering materials, and in particular the reports of Ulanoff and Burstein appended thereto, for the value of the recyclers.  Because he was not an engineer and had no expertise in plastics materials or plastics recycling, Maxfield cautioned that he did not know if the representations in the offering materials were true, and that the only way to know with any certainty would be to hire an independent expert or appraiser.  However, petitioners and Maxfield did not hire a plastics engineering or technical expert with respect to the Plastics Recycling transactions.  In the end, petitioners and Maxfield relied exclusively on the offering materials and insiders to the transactions for the value and purported uniqueness of the machines.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23.  However, the facts in the Mauerman case are distinctly different from the facts of these cases.  In Mauerman, the Court of Appeals for the Tenth Circuit held that the Commissioner had abused discretion by failing to waive a section 6661 addition to tax.  Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith.  Sec. 6661(c).  The

taxpayer in <u>Mauerman</u> relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in <u>Mauerman</u> was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In petitioners' cases, however, particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their purported adviser. Maxfield had no education, special qualifications, or professional skills or experience in plastics engineering, plastics recycling, or plastics materials, nor did he consider himself to be an investment analyst or even an expert in tax shelters. Consequently, petitioners' reliance on the <u>Mauerman</u> case is rejected.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships. In these cases, respondent could find that petitioners' respective reliance on the offering materials and Maxfield was unreasonable. The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. We hold that respondent's refusal to waive the section 6659 additions to tax in these cases is not an abuse of discretion. Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the

underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

D. Petitioners' Motions For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law

Long after the trials of these cases, petitioners each filed a Motion For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50.  Petitioners also lodged with the Court motions for decision ordering relief from the additions to tax for negligence and from the increased rate of interest, with attachments and memoranda in support of the motions.  Respondent filed objections, with attachments and memoranda in support thereof and petitioners thereafter filed reply memoranda.  Petitioners argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in docket Nos. 10382-86 and 10383-86, each of which was styled Miller v. Commissioner.  See Farrell v. Commissioner, T.C. Memo. 1996-295 (denying a motion similar to petitioners' motions); see also Friedman v. Commissioner, T.C. Memo. 1996-558; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

Counsel for petitioners seek to raise a new issue long after the trials in these cases.  Resolution of such issue might well

require new trials.  Such further trials "would be contrary to
the established policy of this Court to try all issues raised in
a case in one proceeding and to avoid piecemeal and protracted
litigation."  Markwardt v. Commissioner, 64 T.C. 989, 998 (1975);
see also Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974).
Consequently, under the circumstances here, at this late date in
the litigation proceedings, long after trial and briefing and
after the issuance of numerous opinions on issues and facts
closely analogous to those in these cases, petitioners' motions
for leave are not well founded.  Farrell v. Commissioner, supra.

Even if petitioners' motions for leave were granted, the
arguments set forth in each of petitioners' motions for decision
and attached memoranda, lodged with this Court, are invalid and
the motions would be denied.  Therefore, and for reasons set
forth in more detail below, petitioners' motions for leave shall
be denied.

Some of our discussion of background and circumstances
underlying petitioners' motions is drawn from documents submitted
by the parties and findings of this Court in two earlier
decisions.  See Estate of Satin v. Commissioner, T.C. Memo. 1994-
435; Fisher v. Commissioner, T.C. Memo. 1994-434.  These matters
are not disputed by the parties.  We discuss the background
matters for the sake of completeness.  As we have noted, granting
petitioners' motions for leave would require further proceedings.

The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements (piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases: Provizer v. Commissioner, T.C. Memo. 1992-177, and the two Miller cases.  We held in Estate of Satin and Fisher that the terms of the piggyback agreement bound the parties to the results in all three lead cases, not just the Provizer case.  Petitioners assert that the piggyback agreement was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[31]

On or about February of 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases.  Baratelli v. Commissioner, T.C. Memo. 1994-484.  Pursuant to the offer, taxpayers had 30 days to accept the following terms:  (1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the extent of loss claimed; (2) Government concession of the

---

[31]   In each of their motions for decision, petitioners state, "After the lead counsel for taxpayers and Respondent had agreed upon the designation of the lead cases, Respondent's counsel prepared piggyback agreements and offered them to counsel for the taxpayers in this case and to other taxpayers." (Emphasis added.)

substantial understatement of tax penalties under section 6661
and the negligence additions to tax under section 6653(a)(1) and
(2); (3) taxpayer concession of the section 6659 addition to tax
for valuation overstatement and the increased rate of interest
under section 6621; and (4) execution of a closing agreement
(Form 906) stating the settlement and resolving the entire matter
for all years.[32]  Petitioners assert that the Plastics Recycling
project settlement offer was extended to them, but they do not
claim to have accepted the offer timely, so they effectively
rejected it.[33]

---

[32]   Except as discussed in infra note 33, the records do not
include a settlement offer to petitioners.  However, petitioners
in each case have attached to their motion for decision a copy of
a settlement offer to another taxpayer with respect to a plastics
recycling case, and respondent has not disputed the accuracy of
the statement of the plastics recycling settlement offer.

[33]   In each of their motions for decision, petitioners state,
"Respondent formulated a standard settlement position which was
extended to all taxpayers having docketed or non-docketed cases
in the plastics recycling group, including Petitioner." (Emphasis
added.)
      In docket Nos. 21518-88 (Sann) and 21519-88 (Addington),
respondent attached to the respective objections to petitioners'
motion for leave a copy of a letter extending the settlement
offer to Sann and Addington.  The letters, dated December 6,
1988, were addressed to counsel for Sann and Addington at the
time, Stephen D. Gardner.  Addington and the Sanns have not
disputed the accuracy of the copies of the settlement offers in
docket Nos. 21518-88 and 21519-88.
      Respondent also attached to those same objections a copy of
the respective reply letters.  Dated December 23, 1988, the reply
letters reject the offers of settlement but indicate a
willingness to be bound by a final decision in the Provizer case,
but only if the proposed form of stipulation is modified so as
not to bind them to a settlement, inter alia.  Addington and the
Sanns have not disputed the accuracy of the copies of the reply
letters.

In December 1988, the <u>Miller</u> cases were disposed of by settlement agreement between the taxpayers and respondent.[34] This Court entered decisions based upon those settlements on December 22, 1988.  The settlement provided that the taxpayers in the <u>Miller</u> cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the additions to tax under the provisions of section 6661 and section 6653(a).  The increased interest under section 6621(c), premised solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that time.  Respondent did not notify petitioners or any other taxpayers of the disposition of the <u>Miller</u> cases.  <u>Estate of Satin v. Commissioner</u>, <u>supra</u>; <u>Fisher v. Commissioner</u>, <u>supra</u>.

Petitioners argue that they are similarly situated to Miller, the taxpayer in the <u>Miller</u> cases, and that pursuant to the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in those cases.  In effect, petitioners seek to resurrect the piggyback agreement offer and/or the settlement offer they previously failed to accept.

---

[34]   Although it is not otherwise a part of the records in these cases, respondent attached copies of the <u>Miller</u> closing agreement and disclosure waiver to the objections to petitioners' motions for leave, and petitioners do not dispute the accuracy of the document.

Petitioners contend that under the principle of "equality," the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference.  United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973).  According to petitioners, the principle of equality precludes the Commissioner from making arbitrary distinctions between like cases.  See Baker v. Commissioner, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational.  While petitioners and Miller both invested in the Plastics Recycling transactions, their actions with respect to such investments provide a rational basis for treating them differently.  Miller foreclosed any potential liability for increased interest in his cases by making payments prior to December 31, 1984; no interest accrued after that date.  In contrast, petitioners made no such payment and they conceded that the increased rate of interest under section 6621(c) applies in their cases.  Liability for the increased rate of interest is the principal difference between the settlement in the Miller cases, which petitioners declined when they failed to accept the piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the <u>Miller</u> cases since each of the decisions in <u>Miller</u> recites "That there is no increased interest due from the petitioner[s] for the taxable years [at issue] under the provisions of IRC section 6621(c)."  According to petitioners, "if the Millers were not otherwise subject to the penalty interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include such a recital in its decisions."  This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies.  In fact, the recital that no increased interest under section 6621(c) was due in the <u>Miller</u> cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy.  There is nothing on the record in the present cases, or in the Court's opinions in <u>Estate of Satin v. Commissioner</u>, T.C. Memo. 1994-435, or <u>Fisher v. Commissioner</u>, T.C. Memo. 1994-434, or in any of the material submitted to us in these cases that would indicate that the Millers were "otherwise subject to the penalty interest provisions".  Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated and differently to the extent they were not.  Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while

petitioners concede it applies in their cases.  Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the <u>Miller</u> cases, and also rejected a settlement offer made to them prior to trial of a test case.  In contrast, Miller negotiated for himself and accepted an offer that was essentially the same as the Plastics Recycling project settlement offer rejected by petitioners prior to trial.  Accordingly, petitioners' motions are not supported by the principle of equality on which they rely.  Cf. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.

To reflect the foregoing,

<u>Appropriate orders will be issued denying petitioners' motions, and decisions will be entered for respondent in docket Nos. 21518-88, 21519-88, 22399-90, 22466-90, and under Rule 155 in docket Nos. 4789-89 and 21209-90</u>.